IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| E. Moran, Inc.<br>Plaintiff<br><br>         v.<br><br>Tomgal, LLC<br>Defendant. | Civil No.  22-1647 (ADC-GLS) |

**REPORT AND RECOMMENDATION**

Pending before the Court is Plaintiff E. Moran, Inc.'s ("EMI") request for a preliminary injunction under the Puerto Rico Dealer's Act, 10 P.R. Laws Ann. §§ 278 et seq. (hereinafter, "Law 75"). Docket No. 8. The District Judge referred the matter to the undersigned for a Report and Recommendation. Docket No. 12. For the reasons discussed below, the undersigned recommends that EMI's request for a preliminary injunction be **DENIED**.

   **I.   Background**

On December 29, 2022, EMI filed a complaint against Defendant TomGal, LLC. d/b/a Robin Ruth ("Robin Ruth"). Docket No. 1. EMI alleges that it is the distributor of Robin Ruth in Puerto Rico and that Robin Ruth undermined, breached, and impaired the parties' exclusive distribution agreement without just cause when it delayed shipments to EMI in 2021, failed to deliver purchase orders in 2022, and withheld payment over pending invoices from Walmart stores in Puerto Rico in 2022. Id. at 3-4. EMI claims that Robin Ruth's actions constitute a violation of Law 75.

EMI moved the Court for a preliminary injunction requesting that Robin Ruth cease, desist and refrain from impairing the parties' exclusive distribution agreement. Docket No. 8 at 15. EMI alleges that Robin Ruth impaired the distribution agreement by delaying shipments, refusing to fill purchase orders, and by withholding payment of pending invoices. Id. at 12. EMI further alleges that Robin Ruth intended to terminate the distribution relationship without just cause. Id. EMI requests that the Court order Robin Ruth to release and deliver all pending purchase orders placed

1

and paid by EMI, refrain from appointing a different distributor in Puerto Rico, and refrain from changing any terms or conditions of the agreement during the pendency of litigation. Id. at 15-16. Robin Ruth opposed alleging that EMI voluntarily withdrew from the distribution relationship, breached the distribution agreement and acted in bad faith. Robin Ruth further argues that EMI's motion is barred by the doctrine of laches as EMI waited six (6) months— from July 2022 to December 2022— to seek relief from the Court.[1] Docket No. 24 at 2; 16-27. EMI replied. Docket No. 39.

The parties submitted a list of stipulated facts. Joint Stipulated Facts at Docket No. 38 ("JSF"). An evidentiary hearing was held on February 24, March 1, and March 15, 2023. The Court heard the testimonies of Emiliano José Moran Rivera ("Moran"), the General Manager of EMI, and Robin Ruth employees, Omri Shabi ("Shabi") and Benjamin Jablonski ("Jablonski"). Docket Nos. 42, 49, and 50. Documentary evidence was admitted. The parties submitted post-hearing briefs. Docket Nos. 55 and 56. The Court makes the following findings of fact **solely for purposes of making a recommendation as to EMI's request for a preliminary injunction.** See José Santiago, Inc. v. Smithfield Packaged Meats Corp., 2023 WL 3069638 at 1 (1st Cir. April 25, 2023) (at preliminary injunction stage conclusions bearing on the merits are statements as to probable outcomes) (citations and quotations omitted).

1. Robin Ruth is a global brand of high-quality fashion accessories for the tourism industry. Testimonies of Shabi and Jablonski.

2. In the summer of 2012, Robin Ruth designated EMI as its exclusive distributor in Puerto Rico.[2] Testimony of Moran.

3. EMI agreed to open and maintain the Puerto Rico market for Robin Ruth products. Testimonies of Moran and Shabi.

4. EMI and Robin Ruth did not sign a written distribution agreement. JSF ¶ viii; Testimonies of Moran and Shabi.

---

[1] Given the Court's recommendation below, there is no need to address Robin Ruth's argument regarding EMI's voluntary termination of the distribution agreement or its laches defense at this preliminary stage.

[2] The parties stipulated that EMI has been the sole authorized distributor of Robin Ruth products in Puerto Rico since 2012. JSF ¶¶ vi-vii. However, the distribution agreement that Robin Ruth requested EMI sign provided that EMI would be designated as an exclusive distributor of Robin Ruth. Docket No. 53-1, Defendant's Exhibit B. Jablonski testified that the distribution agreement attempted to formalize the existing business relationship with EMI. Testimony of Jablonski.

5. EMI has distributed its own products for the tourism market in Puerto Rico since 2004. Over time, EMI added products in the same category as Robin Ruth products. Testimony of Moran.

6. As part of its distribution relationship with Robin Ruth, EMI could not sell non-Robin Ruth products with the "multicity design".[3] Testimony of Moran.

7. In 2018, Robin Ruth requested that EMI sign a written distribution agreement. Testimonies of Moran and Shabi.

8. On December 11, 2019, Jablonski sent Moran a follow-up email with a copy of the distribution agreement. Docket No. 53-1, Defendant's Exhibit E; Testimony of Jablonski.

9. On January 31, 2020, Jablonski sent Moran an email with a copy of the same distribution agreement. Docket No. 53-1, Defendant's Exhibit B; Testimony of Moran.

10. Section 2.3.1 of the proposed distribution agreement provides: "RR agrees that Distributor may continue to sell others' products having different designs from RR, but that RR may deem to be similar to RR's Products, so long as Distributor was selling such products prior to the start of Distributors relationship with RR, and so long as such other products are disclosed and listed in Exhibit A. Distributor shall not sell, offer for sale, or distribute, any other products not listed on Exhibit A that RR deems to be similar to its Products, in its sole discretion." Docket No. 53-1, Defendant's Exhibits B and E.

11. The proposed written distribution agreement was intended to reduce to writing the verbal agreement already in place between Robin Ruth and EMI. Testimony of Jablonski.

12. EMI did not sign the distribution agreement proposed by Robin Ruth. JSF ¶ viii; Testimony of Jablonski.

13. The points of sale for Robin Ruth products in Puerto Rico include Walgreens, CVS, Walmart, Aerostar, Travel Traders, U.S. Coastguard Exchange, and gift shops. Testimony of Moran.

14. In 2021, shipments from Robin Ruth to EMI took longer than normal to arrive in Puerto Rico. Testimony of Moran.

---

[3] There is a general understanding that Robin Ruth bags described as "multicity", "classic" or "Kosai" are bags in which the name of a city or country appears multiple times on the product. Testimonies of Moran, Shabi, and Jablonski.

15. EMI began purchasing Fashion Code products no later than September 10, 2021. Docket No. 53-1, Exhibit 1; Testimonies of Moran and Jablonski.

16. Fashion Code is a brand created by Franchesco Castano ("Castano") during his tenure at Robin Ruth. Castano was the Partnership Director at Robin Ruth from 2012 until 2021. Testimony of Jablonski.

17. In 2013, Castano signed a confidentiality and a non-compete agreement with Robin Ruth. Testimony of Jablonski.

18. Certain Fashion Code products are very similar in stitching, quality, and design to Robin Ruth products. Docket No. 53-1, Defendant's Exhibit J-3; Testimonies of Shabi and Jablonski.

19. On April 20, 2022, EMI's Purchase Order No. 47 ("PO No. 47") to Robin Ruth was confirmed and EMI paid Robin Ruth $94,213.48. JSF ¶ x.

20. PO No. 47 was put on hold by Robin Ruth. JSF ¶ xviii.

21. In June 2022, EMI placed products purchased from Fashion Code in spaces previously approved for Robin Ruth products at Walmart. Testimonies of Moran[4] and Shabi.

22. Some of the spaces in which Fashion Code products were placed by EMI were shelves that were labeled with the Robin Ruth logo. Docket No. 53-1, Defendant's Exhibit J-2; Testimonies of Moran and Jablonski.

---

[4] Moran's testimony was as follows:

Q. Those products were being placed at the Walmart stores in the spaces and the shelves that were designated for Robin Ruth?

A. The spaces where these products were being located were spaces that had been approved by the modular and had been approved by Walmart's purchaser.

Q. And those spaces were being used previously for the sale of the Robin Ruth products, correct?

A. At some stores, yes.

Q. Some of the spaces had a Robin Ruth logo identifying the space as such?

A. The stores that had those spaces that bore the logo of Robin Ruth were displays that we had brought to the stores through the efforts of sales representatives.

Q. So your answer is, yes?

A. Yes.

23. By June 2022, EMI had placed Fashion Code neck pillows in Walmart. The tags of those products contained a barcode registered in the Walmart system to Robin Ruth. These products were found in a section previously used for Robin Ruth products. Docket No. 53-1, Defendant's Exhibit J-1; Testimony of Jablonski.

24. On August 30, 2022, Moran, Moran's father and Shabi participated in a Zoom meeting. JSF ¶ xv; Testimony of Shabi.

25. During the Zoom meeting, Shabi told Moran that he could not sell competing Fashion Code products. Testimonies of Shabi and Moran.

26. Moran and Shabi discussed the possibility of terminating the distribution relationship between Robin Ruth and EMI. Testimonies of Moran and Shabi.

27. On September 1, 2022, Shabi sent Moran a Letter of Voluntary Termination. JSF ¶ xvi; Docket No. 54-1, Joint Exhibit III.

28. EMI did not sign the letter of termination. Testimonies of Moran and Shabi.

## II.  Preliminary Injunction under Law 75

Law 75 was adopted to protect Puerto Rican distributors "from the harm caused when a supplier arbitrarily terminates a distributorship once the dealer has created a favorable market for the supplier's products." Freightliner, L.L.C. v. Puerto Rico Truck Sales, Inc., 399 F. Supp. 2d 57, 78 (D.P.R. 2005) (quoting R.W. Int'l Corp. v. Welch Food, Inc., 13 F.3d 478, 482 (1st Cir.1994)). The court may grant a preliminary injunction ordering the parties to continue their relationship as established in the distribution contract pending litigation. See P.R. Laws Ann. Tit. 10, § 278b-1 (2014) ("the court may grant [...] any provisional remedy [...] ordering any of the parties, or both, to continue, in all its terms, the relation established by the dealer's contract, and/or to abstain from performing any act or any omission in prejudice thereof.").

Per the text of the statute, the main criteria for a preliminary injunction under Law 75 are the interests of the parties and issues of public policy fostered by Law 75. P.R. Laws Ann. Tit. 10, § 278b-1 (2014). The policy of Law 75 promotes "the continuation of dealership agreements and the strict adherence to the provisions of such agreements." Waterproofing Sys., Inc. v. Hydro-Stop, Inc., 440 F.3d 24, 33 (1st Cir. 2006) (quoting DeMoss v. Kelly Servs., Inc., 493 F.2d 1012, 1015 (1st Cir. 1974)). And seeks to prevent impairment or termination without just cause. José Santiago Inc. v. Smithfield Foods, Inc., 2022 WL 2155023 at 3 (D.P.R. 2022); Luis Rosario, Inc. v. Amana Refrigeration, Inc., 733 F.2d 172, 173 (1st Cir. 1984). Potential irreparable injury and

likelihood of success on the merits affect the Court's analysis of the "parties' interests and the question of whether an injunction would further Law 75's public policy." Id. Furthermore, "[t]he strength of the parties' interests also may depend upon the likelihood that 'just cause' will be found." Id. (quoting Luis Rosario, Inc. v. Amana Refrigeration, Inc., 733 F.2d at 173). As such, Courts generally consider all four traditional factors applicable to requests for preliminary injunction in cases for equitable relief under Law 75. See Beatty Caribbean, Inc. v. Nova Chemicals, Inc., 2009 WL 2151303 at 9-18 (D.P.R.).

### III. Discussion

Law 75 seeks to protect dealers in Puerto Rico from unjust termination or impairment of a distribution relationship. A dealer is a "[p]erson actually interested in a dealer's contract because of his having effectively in his charge in Puerto Rico the distribution, agency, concession or representation of a given merchandise or service." P.R. LAWS ANN. TIT. 10, § 278(a) (2014). A dealer's contract is defined as a:

> Relationship established between a dealer and a principal or grantor whereby and irrespectively of the manner in which the parties may call, characterize or execute such relationship, the former actually and effectively takes charge of the distribution of a merchandise, or of the rendering of a service, by concession or franchise, on the market of Puerto Rico. P.R. LAWS ANN. TIT. 10. § 278(B) (2014).

Law 75 protects exclusive and non-exclusive distributors but does not transform non-exclusive contracts into exclusive contracts. Medina & Medina Inc. v. Hormel Foods Corp., 840 F.3d 26, 41-42 (1st Cir. 2016).

The parties do not dispute that EMI has been the sole authorized distributor of Robin Ruth products in Puerto Rico since 2012. JSF ¶ vii; Testimonies of Moran and Shabi. Moran testified that he has been Robin Ruth's exclusive distributor for Puerto Rico since 2012. Testimony of Moran. Jablonski's testimony was consistent with Moran's. Jablonski testified that the draft of the distribution agreement presented by Robin Ruth to EMI in 2018 and 2020 was intended to reduce to writing the existing relationship between Robin Ruth and EMI. Testimony of Jablonski. And the proposed written distribution agreement stated that Robin Ruth would grant EMI exclusive rights to wholesale Robin Ruth products in Puerto Rico. Docket No. 53-1, Defendant's Exhibit B. There is thus sufficient evidence to conclude that EMI is an exclusive distributor of Robin Ruth products in Puerto Rico subject to the protections of Law 75.

**1. Likelihood of success on the merits.**

To prevail in a claim under Law 75, the distributor must establish that it is a dealer under Law 75 and that the distribution agreement has been impaired or terminated. The principal bears the ultimate burden of showing just cause for the impairment. Newell Puerto Rico, Ltd. v. Rubbermaid Inc., 20 F.3d 15, 23 (1st Cir. 1994); José Santiago, Inc. v. Smithfield Packaged Meats Corp., 2023 WL 3069638 at 5. See R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d 49, 53 (1st Cir. 1996) (summary judgment in favor of principal when distributor did not proffer competent evidence to rebut the facts relied on by principal to justify termination). "[W]hether or not an impairment has taken place will depend upon the specific terms of the distribution contract." Medina & Medina Inc. v. Hormel Foods Corp., 840 F.3d at 41 (quoting Irvine v. Murad Skin Rsch. Lab'ys, Inc., 194 F.3d 313, 318 (1st Cir. 1999)). Law 75 does not require contractual obligations to be in writing. Id. at 49 n.16; José Santiago, Inc. v. Smithfield Packaged Meats Corp., 2023 WL 3069638 at 4. When there is no written contract, Courts look to the parties' regular course of dealing to determine the terms of the agreement. Medina & Medina, 840 F.3d at 49 n.15.

EMI alleges that Robin Ruth impaired the distribution relationship when Robin Ruth refused to deliver the products requested in its purchase orders in 2022 (and did not return the $94,213.48 deposit made by EMI), delayed shipments in 2021, and withheld payment of pending invoices ($65,934.39) from Walmart stores in 2022. Docket No. 8 at 4-5. There is no dispute that, despite receiving PO No. 47 from EMI, Robin Ruth has not shipped the products to EMI, has not returned the $94,213.48 deposit, and has placed the purchase order on hold. JSF ¶¶ ix-xiv, xviii-xix. As to the $65,934.39 claimed by EMI on account of pending invoices, Shabi testified that, due to Robin Ruth's national account with Walmart, Robin Ruth is paid first and subsequently it pays its distributors. EMI did not present any evidence of an established time frame for Robin Ruth to make payments to EMI under their distribution agreement. But there is a rebuttable presumption of impairment when a principal fails to fill an order in reasonable amounts and within a reasonable time frame. P.R. LAWS ANN. TIT. 10. § 278a-1(b)(3) (2014). The Court will, for purposes of this recommendation only, assume that the actions claimed by EMI (particularly, the refusal to deliver on PO No. 47 or to return the deposit) could constitute an impairment of EMI's distribution of

7

Robin Ruth's products in Puerto Rico.[5] See e.g., José Santiago, Inc. v. Smithfield Packaged Meats Corp., 2023 WL 3069638 at 9 (filling orders part of a principal's contractual obligations when there is evidence that orders were consistently dispatched).

When an impairment has been established, Law 75 requires the Court to consider "the likely presence or absence of 'just cause' as part of the likelihood of success on the merits." Freightliner, L.L.C. v. Puerto Rico Truck Sales, Inc., 399 F. Supp. 2d at 72.[6] Law 75 defines "just cause" as [1] "[n]onperformance of any of the essential obligations of the dealer's contract, on the part of the dealer, or any action or [2] omission on his part that adversely and substantially affects the interests of the principal or grantor in promoting the marketing or distribution of the merchandise or service." P.R. LAWS ANN. TIT. 10. § 278(d) (2014). The Puerto Rico Supreme Court has also recognized that, irrespective of the dealer's conduct, a principal's own circumstances can also justify an impairment or termination of a distribution agreement. José Santiago Inc. v. Smithfield Foods, Inc., 2023 WL 3069638 at 10 (quoting R.W. Int'l Corp. v. Welch Foods, Inc., 88 F.3d at 52; Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d at 822–23). Ultimately, however, whether there is just cause under Law 75 will depend on the facts of each case. Freightliner, 399 F. Supp. 2d 57 at 73.

The Court considers whether EMI could have defaulted on any of the essential obligations of the distribution relationship or whether any of EMI's actions adversely and substantially affected Robin Ruth's interests in promoting its products in Puerto Rico. Moran testified that EMI's duties as distributor for Robin Ruth included keeping the market in a good condition for Robin Ruth products. Testimony of Moran. And that, since the beginning of the relationship, EMI sold products that competed with Robin Ruth products so that EMI's sale of Fashion Code products was not a violation of EMI's obligations under the distribution relationship with Robin Ruth. Robin Ruth disagrees and posits that EMI was not allowed to sell competing products, much less products similar in design to those of Robin Ruth.

---

[5] As to delayed shipments in 2021, Moran testified that a distributor in Florida received Robin Ruth products quicker and Jablonski testified that the COVID 19 pandemic created delays in production and dislocation in the container market for Robin Ruth products for all distributors. Moran had no knowledge of when the Florida distributor ordered the products that were purportedly delivered faster.

[6] "[N]o principal or grantor may directly or indirectly perform any act detrimental to the established relationship or refuse to renew said contract on its normal expiration, except for just cause." P.R. LAWS ANN. TIT. 10. § 278a (2014).

Since there is no written distribution agreement between Robin Ruth and EMI, the Court must rely on the course of dealing between the parties. Moran testified that EMI always sold products in the same category as Robin Ruth's and had no limitations in selling similar products for the tourism market, except that it could not sell non-Robin Ruth products with the "multicity" design. The proposed distribution agreement emailed to EMI in 2019 and 2020 contemplated the possibility that a distributor such as EMI could sell competing products (similar products), so long as these had different designs as those of Robin Ruth and were previously disclosed. Docket No. 53-1, Defendant's Exhibits B and E. Jablonski testified that the proposed distribution agreement was simply an effort to put in writing the verbal agreement that was already in place. Furthermore, although he denied that EMI was allowed to sell competing products, Shabi's testimony revealed that EMI was chosen as the Robin Ruth distributor in Puerto Rico after he learned that EMI had sold a product which copied the "Classic Bag". This supports the conclusion that EMI sold products targeted to the tourist industry in Puerto Rico prior to becoming the distributor for Robin Ruth. In contrast, Robin Ruth did not present any concrete evidence that could lead the Court to conclude that EMI was prohibited from selling any competing products in Puerto Rico.

But this does not end the Court's inquiry. Even assuming for purposes of EMI's request for relief under Law 75 that EMI could sell competing products in Puerto Rico, the evidence presented during the hearing sustains a preliminary finding of just cause. Since September 2021, EMI began to purchase Fashion Code products. Testimony of Moran. As evidenced during the hearing, these products are remarkably similar to those of Robin Ruth. Testimonies of Shabi and Jablonski. Indeed, Jablonski testified that these products are so similar that he would have a hard time making a distinction. Docket No. 53-1, Defendant's Exhibit J-3; Testimony of Jablonski. The Fashion Code brand was created and developed by an executive of Robin Ruth, while employed at Robin Ruth. Testimony of Jablonski. Despite having a confidentiality and non-compete agreement, the employee created the brand and made sales to Robin Ruth's exclusive distributors without Robin Ruth's knowledge. Testimony of Jablonski. Fashion Code sold EMI the same types of products as Robin Ruth but at cheaper prices. Testimony of Jablonski. The evidence presented during the hearing established that, on June 2022, EMI placed products purchased from Fashion Code in Walmart, a historical point of sale for Robin Ruth. Some of the spaces in which Fashion Code products were placed by EMI had been approved for the sale of Robin Ruth products. Docket No. 53-1, Defendant's Exhibit J-2; Testimony of Moran. EMI placed Fashion Code products on

shelves previously used to display Robin Ruth products, which were labeled with the Robin Ruth logo. Testimonies of Moran and Jablonski; Docket No. 53-1, Defendant's Exhibit J-2. Indeed, Jablonski testified that there were Fashion Code products alongside Robin Ruth products in a Walmart display which had only previously had Robin Ruth products. Docket No. 53-1, Defendant's Exhibit J-1; Testimony of Jablonski. And during an investigation Robin Ruth found that Fashion Code products at Walmart had been tagged with the Universal Product Code ("UPC") assigned to Robin Ruth products in the Walmart system. Docket No. 53-1, Defendant's Exhibit J-1; Testimony of Jablonski. As testified by Jablonski, this put Robin Ruth's vendor agreement with Walmart at a national level at risk. Per Robin Ruth's agreement with Walmart, Robin Ruth would have to indemnify Walmart if there were problems with its products. Robin Ruth had no way of knowing the way Fashion Code products were manufactured. The sale of Fashion Code products with the Robin Ruth UPC opened Robin Ruth to potential liabilities. Testimony of Jablonski. And could damage Robin Ruth's reputation and goodwill because (given the similarities in the designs and stitching of the products) customers purchasing Fashion Code products could realistically believe they were purchasing Robin Ruth products. Testimony of Jablonski.

The First Circuit's decision in R.W. Int'l Corp. v. Welch Food, Inc., 88 F.3d 49 (1st Cir. 1996) is helpful here. The principal in R.W. terminated the dealer pointing to a conflict of interest in representing two competing lines. Id. at 51. The First Circuit expressed "[i]f Welch's conflict-of-interest concerns about R.W. are legitimate, we have no doubt that this would constitute 'just cause' under Law 75." Id. at 53. The First Circuit noted that just cause to terminate in that case consisted of the dealer's advertisement for the competing product while omitting an advertisement of the principal's product, the dealer's stocking of the principal's products on the bottom shelves of retail store freezers while placing the competitor's product at eye level and decreasing profits for the principal's products. Id. at 52. The First Circuit found just cause because there were "strong signals" that the distributor was shifting its primary attention to its newly expanded competing line at the expense of the principal. Id. at 53. While EMI may be able to establish that it is an exclusive dealer of Robin Ruth in Puerto Rico and that it was at liberty to sell competing products to those of Robin Ruth, it is not reasonable to conclude that EMI could use the shelves and logo of Robin Ruth to sell the competing brand of Fashion Code, especially given the similarities between the Fashion Code products and those of Robin Ruth. It is also not reasonable to conclude that EMI could use the Robin Ruth UPC in the tags of the Fashion Code product. At this time and without

the benefit of discovery, these actions could certainly be held to constitute defaults on EMI's essential obligations in the distribution of Robin Ruth and to have adversely and substantially affected Robin Ruth's interests in promoting its products in Puerto Rico. PPM Chem. Corp. of P.R. v. Saskatoon Chem. Ltd., 1990 WL 98404, 6 (D.P.R. June 29, 1990) (quoting Carlos Rodriguez Vidal, *The Concept of Just Cause for the Lawful Termination of Dealership under the Dealers' Contract Law of Puerto Rico*, Vol. 58:2 REV. JUR. UPR 261, 263 (1989) (one of distributor's essential obligations is "'the creation or development of a favorable market for the principal's products or services in Puerto Rico.'"). And to have ultimately provided Robin Ruth just cause under Law 75. Reaching the contrary conclusion would be to conclude that while Robin Ruth is required to sell exclusively through EMI, EMI could be allowed to use the market already developed for Robin Ruth to prioritize competing (and very visually similar) products from Fashion Code. But Law 75 is not intended to impose unreasonable restrictions on the principal's business. See José Santiago, Inc. v. Smithfield Packaged Meats Corp., 2023 WL 3069638 at 10-12 (discussing a flexible approach to just cause). EMI's request for equitable relief is not supported by the purpose behind Law 75: to level the playing field and not subordinate one enterprise to another. Id. at 12. With the evidence as it stands today, the Court cannot conclude that EMI is likely to succeed on the merits.

**2. Irreparable harm.**

"[I]irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief." Prime Wholesalers, Inc. v. Fields Motorcars of Fla., Inc., 2009 WL 2612519, 12 (D.P.R.) (quoting Charlesbank Equity Fund II Ltd. v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004)). "The burden is on the movant to demonstrate that the denial of preliminary injunctive relief is likely to cause irreparable harm and such showing must be 'grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store.'" Id. (quoting Alina & A Tours, Inc. v. Royal Caribbean Cruises, Ltd., 2006 WL 897975, 6 (D.P.R.)).

EMI argues that it has suffered, and will continue to suffer, irreparable harm due to a loss in sales because of the purchase orders which were put on hold, loss of shelving space in retail stores due to lack of inventory, loss of credibility as a distributor, and a reduction in annual sales. Docket No. 56 at 21. The Court is not convinced. EMI's claim of lost sales and reduction in annual sales are purely economic in nature and can be addressed with a monetary award. Beatty Caribbean, Inc. v. Nova Chemicals, Inc., 2009 WL 2151303 at 16. While EMI has less inventory

because Robin Ruth has put on hold its purchase orders, there is no question that EMI has an alternate source of products in Fashion Code. And the fact that, as testified by Moran, airport stores are unwilling to accept products that are not Robin Ruth is insufficient to establish potential irreparable harm. See A & M Globe Mktg. Corp. v. Selected Trading Corp., 2005 WL 8167893 at 6 (D.P.R.) (no irreparable harm when distributor handles other lines in Puerto Rico and continues doing business while losing 10 to 11% of that business); Prime Wholesalers, Inc., 2009 WL 2612519 at 12 (no irreparable harm when distributor claimed that ninety percent of its business was derived from the products of its principal because economic damages, including lost sales and profits, could be compensated with a monetary award).

### 3. Balance of the equities and the interests of the parties.

The balance of the equities weighs the hardship for the moving party if injunctive relief is not granted against the non-movant's hardship if injunctive relief is granted. Beatty Caribbean, Inc. v. Nova Chemicals, Inc., 2009 WL 2151303 at 16. EMI requests that Robin Ruth release and deliver its pending purchase orders, refrain from appointing a different distributor in Puerto Rico pending litigation, and refrain from changing any of the terms and conditions of the distribution agreement. Docket No. 8 at 15-16. EMI argues that maintaining intact the distribution relationship will cause Robin Ruth no harm. And that Robin Ruth stands to gain from the injunctive relief because it could resume sales and regain its market presence in Puerto Rico. EMI also alleges that the market in Puerto Rico represents only two percent of Robin Ruth's total revenue. EMI further argues that absent injunctive relief, EMI will continue losing business and will lose half of its source of revenue. Docket Nos. 8 at 14-15 and 56 at 22-23.

Granting injunctive relief would be harmful to Robin Ruth's interests because it would force Robin Ruth's products to be distributed solely through EMI, while permitting EMI to prioritize the sale of Fashion Code products in shelve space and retailers previously used to promote Robin Ruth. While it is true that Robin Ruth would resume sales and regain market presence in Puerto Rico, Shabi testified that the value of the Robin Ruth brand is more important than money. And allowing EMI to continue to sell Fashion Code products (which are very similar in designs to the Robin Ruth products) in shelves intended for Robin Ruth and under the Robin Ruth logo could, as discussed above, damage Robin Ruth's goodwill and expose Robin Ruth to potential liabilities. Picker Intern. v. Kodak Caribbean, Ltd., 826 F.Supp. 610, 614 (1993) (principal's claim that distributor promoted products of principal's competitors over those of

12

principal a factor weighing against issuing a preliminary injunction for distributor). The balance of interests weighs against EMI's request for injunctive relief.

### 4. Public policy of Law 75.

The core public policy of Law 75 is to prevent principals from terminating distributors without just cause. Freightliner, L.L.C. v. Puerto Rico Truck Sales, Inc., 399 F. Supp. at 78. But "[i]t cannot be disputed that Act 75's public policy is not to protect distributors who deal unfairly with their principals and abuse the protections afforded under the Act." Id. at 78. Law 75 does not cure violations of essential obligations. Id. Indeed, in affirming a denial of a request for preliminary injunction under Law 75 in José Santiago, Inc. v. Smithfield Packaged Meats Corp., 2023 WL 3069638 at 10, the First Circuit very recently stated it "[…] would raise serious constitutional objections [if Law 75] turn[ed] dealerships into interminable relationships, [such that principals] would be subjected to live in perpetual symbiosis with the distributors under all types of circumstances.". Id. (quoting Medina & Medina v. Country Pride Foods, Ltd., 858 F.2d at 822-823 and Borg Warner International Corp. v. Quasar Co., 138 D.P.R. 60, 85 (P.R. 1995) (official translation at 24) (Law 75 "cannot serve as a straitjacket, restricting […] every move the principal makes without taking into consideration justifiable situations […]). The Court is thus tasked with taking into consideration the interests of both the distributor and the principal in deciding whether preliminary injunctive relief would promote the public policy of Law 75 in this case.

EMI argues that if a preliminary injunction is not issued, Robin Ruth will continue to abuse its power and harm EMI by preventing it from accessing and distributing high quality Robin Ruth products. EMI further argues that there is little to no inventory of Robin Ruth products in stores in Puerto Rico and the public will also suffer when they cannot access the products. Docket Nos. 56 at 23-24 and 8 at 15. But the evidence received by the Court established that EMI was selling Fashion Code products in lieu of Robin Ruth; allowing the products to be placed in the shelves previously used for Robin Ruth, allowing the products to be sold under the Robin Ruth logo, and allowing the products to be tagged with the Robin Ruth UPC. The evidence also established that Fashion Code products are not mere competing products. These are products that have very similar designs, making it very difficult for consumers to distinguish between the two brands. Granting EMI's request for injunctive relief would allow EMI to have exclusive access to Robin Ruth products while prioritizing Fashion Code products. This factor weighs against granting injunctive relief.

**IV.    Conclusion**

Having considered the testimonial and documentary evidence, the Court finds that EMI has not demonstrated a likelihood of success on the merits, and that the interests of the parties and the public policy of Law 75 weigh against granting the requested injunctive relief. The undersigned recommends that EMI's request for a preliminary injunction be **DENIED.**

This Report and Recommendation is filed pursuant to 28 U.S.C. §636(b)(1) and Rule 72(d) of the Local Rules of this District Court. Pursuant to Local Rule 72(d), the parties have **fourteen (14) days** to file any objections to this Report and Recommendation. Failure to file specific objections within the specified time precludes further review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccarone, 973 F. 2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Electric Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Secretary of Health and Human Services, 836 F.2d 4, 6 (1st Cir. 1987); Maisonet v. Genett Group, Inc., 863 F.Supp.2d 138, 143 (D.P.R. 2012) (absent specific objection, no obligation to review portion of Magistrate Judge's recommendation).

**IT IS SO RECOMMENDED.**

In San Juan, Puerto Rico, this 2nd day of May 2023.

                                                          s/Giselle López Soler
                                                          GISELLE LOPEZ SOLER
                                                          United States Magistrate Judge